**IN THE**
**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| CANNARAMIC MEDIA LLC, and<br>FELICIA PALMER | ) | |
| | ) | |
| *Plaintiff,* | ) | Civil Action No. _19 cv 5215_ |
| | ) | |
| v. | ) | JURY TRIAL DEMANDED |
| | ) | |
| FACEBOOK, INC. | ) | |
| | ) | |
| | ) | |
| *Defendant.* | ) | |

---

## COMPLAINT

### I. Introductory Statement

1. This is a civil action brought by Cannaramic Media Inc., ("Cannaramic"), a newly formed domestic corporation established under the laws of the State of New York and its founder, Ms. Felicia Palmer ("Ms. Palmer"), a resident of New Jersey, against Facebook, Inc ("Facebook) arising under New York General Business Law § 349, which creates a cause of action for deceptive acts and practices, and New York common-law fraud.  Such practices engaged in by Facebook have resulted in economic loss, censorship, and prevention of the dissemination over the Facebook platform by Plaintiffs of critical information pertaining to cannabis and matters of public health, scientific research and governmental policy which are important to the national interest.

### The Parties

2. Cannaramic is dedicated to furthering the national and international discussion of public health, scientific research and political concerns regarding cannabis and the legalization of

it for medical and adult use purposes in 33 states within the United States and countries around the world.

3.  Ms. Palmer is a cancer survivor who found significant post-surgery health and wellness benefits from her use of cannabis and established Cannaramic and other media outlets to further the national discussion of cannabis for scientific and lifestyle purposes.

4.  Facebook is incorporated in Delaware, and the Company's principal executive offices are located at 1601 Willow Road, Menlo Park, California 94025. Facebook's securities trade on the NASDAQ under the ticker symbol "FB."

5.  Facebook operates the world's largest social networking website with over 2.2 billion active users where users can converse about personal interests and concerns.

6.  Facebook also permits, subject to approval, businesses to purchase advertising and also 'boost posts' and promote matters of governmental and national concern.

7.  Facebook reportedly earned $40 billion in revenue in 2017, the bulk of which came from digital advertisements. On July 25, 2018 the company declared its second-quarter results. reporting $13.2 billion in revenue, up 42% compared to the same period last year with the bulk of such revenue believed to be derived from advertising and boosted posts.

8.  Facebook allows advertising and boosted posts for a price to be widely disseminated or targeted to specific audiences based upon proprietary demographic information kept and maintained by Facebook.

9.  Demographic information may be targeted by a variety of factors including, but not limited to, gender, age, regional location, state, and zip code.

10. On April 11, 2018, Facebook's Chief Executive Officer, Mark Zuckerberg, testified before the United States House of Representatives Energy and Commerce Committee.  In his

congressional testimony Mr. Zuckerberg adamantly insisted that Facebook is not a "media company." Rather, Mr. Zuckerberg insisted, Facebook is a "technology company." "I consider us to be a technology company because the primary thing that we do is have engineers who write code and build product and services for other people."

11. Facebook's declared mission is "to give people the power to build community and bring the world closer together. People use Facebook to stay connected with friends and family, to discover what's going on in the world, and to share and express what matters to them."

12. Advancing the national conversation about cannabis and matters of public health and governmental policy concerning it matter a great deal to Plaintiffs.

### The May 20-24 2019, Cannaramic On-Line Summit

13. Plaintiffs Cannaramic and Palmer are committed to furthering the national dialog regarding cannabis and set out to interview legal experts, activists, scientists, doctors, business leaders, journalists, culinary professionals, and a host of other with the intent to educate the public by rebroadcast of those conversations in a unique and free five-day online video series entitled: "The Cannaramic Online Summit" over their website www.Cannaramic.com.

14. Cannabis related experts selected to help educate and further the dialogue include:

15.

| SPEAKER | TITLE | |
|---|---|---|
| Dee Russell | Chef, Cooking on High (Netflix), Author "The Happy Chef" | |
| Javier Hasse | Journalist, Best-Selling Author, "How To Succeed In The Cannabis Business" | |

3

| | | |
|---|---|---|
| Jeff Siegel | Analyst, Green Chip Stocks | |
| Rob Dipisa, Esq. | Member, Cole Schotz | |
| Wendy Robbins/Karen Paull | Exec. Producers, The Marijuana Show (Amazon Prime) | |
| Roz McCarthy | Founder, Minorities for Medical Marijuana | |
| Alysson Muotri, Ph.D | Researcher, Univ of Cal San Diego | |
| Denise Biderman | Founder, Mary's List | |
| Pelin Thorogood | Founder, Wholistic Research & Education Foundation | |
| Lauren Wilson | Author, Healing with CBD | |
| Jessica Gonzalez, Esq | Founding Partner, Moyeno & Gonzalez, PC | |
| Steven Phan | Owner, Come Back Daily | |
| Dr. Monica Taing | Board Member, Doctors for Cannabis Regulation | |
| Dr. Raphael Mechoulam | Scientist, "The Father of Cannabis Research" | |
| David C. Holland, Esq. | Executive Director, NORML-NY | |
| Melissa Moore | Deputy State Director, Drug Policy Alliance - NY | |
| Redman | Rapper / Actor / Activist | |
| Nelson Guerrero | Executive Director, Cannabis Cultural Association | |
| Dr. Bryan Doner | CMO/Co-Founder, Compassionate Certification Centers | |
| Leo Bridgewater | Co-Founder, LeafLaunch | |
| Jose Belen | Jose Belen Founder & President Mission Zero Inc. | |

| Ryan VandenBussche | NHL (retired)<br>Partner, New Leaf Canada Inc | |
| Riley Cote | Co-Founder, Athletes for Care | |
| Jeffrey Anderson, MD PhD | Researcher, University of Utah | |
| Sasha Simon | Safety First Program Manager, Drug Policy Alliance | |
| Frank "The Legend" Shamrock | UFC Champion | |
| Mario & Kane | Founders, Veterans Vitality | |
| Drumma Boy | Record Producer | |

16. The Summit serves to better familiarize viewers with cannabis related matters and issues in furtherance of the national conversation especially involving matters of public health, public safetyand governmental policy.

17. The national conversation is not easy as the state of the law on the federal and state level is at odds with the other. Presently, while cannabis legalization of some form has been implemented in more than 2/3 of the United States, 'marijuana' the historically derogatory term for cannabis, remains listed as a Schedule I drug under the federal Controlled Substances Act ("CSA"). Congress and various administrations of the federal government continue to believe that cannabis has no legitimate medical use and poses a high risk of abuse to patients and consumers and is detrimental to matters of public health: hence its complete prohibition under the Schedule I designation.

18. Despite the federal law, which is the supreme law of the nation, 33 states have passed legalization laws which are contrary to and in direct derogation of the federal Schedule I designation.

19. As a consequence, state economies continue to grow, businesses are thriving, health issues are being better addressed and conditions alleviated, and a national dialogue is being fostered as a direct result of the passage of cannabis legalization.

20. Despite continuing federal prohibition, members of Congress are seeking to protect those states which have legalized cannabis by proposing legislative measures such as the SAFE (Secure And Fair Enforcement) Banking Act, STATES (Strengthening the Tenth Amendment Through Enabling States) Act, Marijuana Justice Act, Marijuana Freedom and Opportunity Act, and other bills to protect those state legal enterprises and insulate banks from federal repercussions for receiving funds traceable to those state legal operations.

21. The experts and educators interviewed and recorded by Cannaramic as part of the Summit each gave their perspective on cannabis related issues all of which serve to further expand the national dialogue on these important matters of public health and governmental policy.

### Efforts To Promote The Cannaramic On-Line Summit on Facebook

22. Since on or about February, 2019, Cannaramic has maintained a presence on Facebook and Instagram, also owed by Facebook by means of its home page whereby it posts information about cannabis related information including the intended free May 20-24th Cannaramic Online Summit.

23. Several viewers have 'liked' the page and other links and pages which have been identified on Cannaramic's Facebook home page and Instagram homepage.

24. Cannaramic's Facebook and Instagram home pages also contains links to outside sources for further information about cannabis related matters including a link to www.Cannaramic.com where the Online Summit will be broadcast for free for viewers.

25. On or about May 12, 2019, Plaintiffs uploaded several 'posts' thereby placing information simultaneously upon Cannaramic's Facebook home page regarding the upcoming Online Summit which will be broadcast not on Facebook, but on Cannaramic's proprietary website. The posts were 1-minute video excerpts from three of the expert interviews pre-recorded for The Cannaramic Online Summit. The posts specifically provided information about CBD, an extract from industrial hemp/cannabis which is legal nationwide, business tips for being in the cannabis industry and issues of social justice for people of color who have been harmed by the "war on drugs."

26. Upon uploading that post, Facebook sent a digital alert to Plaintiff Palmer that for a fee she could "boost" and promote these informational posts about the upcoming Online Summit.

27. Plaintiff Palmer did then provide the credit card payment information to process the fee online directly to Facebook and thereafter selected demographic criteria to have these informational posts (the "boosted post") only promoted to adults over 25 years old in those 33 states which have legalized medical marijuana.

28. Once the fee was collected and Plaintiff completed her demographic criteria and instructed Facebook to then boost the post, Facebook then rejected the post and did not promote it across the Facebook platform as promised to do by inducing Plaintiffs to spend money to enable such wider dissemination to the targeted audience.

29. After the fee for promoting the post was paid, Facebook then sent a message to Plaintiffs stating that the post contained 'prohibited content' and violated Facebook policy. Specifically, the Facebook response stated:

> "Section 2. Illegal Products or Services. Policy.

Ads must not constitute, facilitate, or promote illegal products, services or activities.  Ads targeted to minors must not promote products, services, or content that are inappropriate, illegal, or unsafe, or that exploit, mislead, or exert undue pressure on the age groups targeted."

30. It is unknown whether a human being or a proprietary mathematical algorithm owned and/or operated by Facebook made the determination to censor the boosted post which did not violate any terms of use.

31. Neither cannabis, paraphernalia related to cannabis, nor any substance whether legal or illegal was made available or mentioned in the boosted post – only information that furthered the national conversation about cannabis which is protected speech under the First Amendment of the United States Constitution.

32. Plaintiffs appealed Facebook's censorship determination at 12:04am on May 12, 2019 under case #2309502899370212.  Defendant responded 5 minutes later at 12:09am stating:

"Thank you for notifying us about your ad disapproval.

We've reviewed your ad again and have determined it complies with our policies. Your ad is now approved.

Your ad is now active and will start delivering soon.  You can track your results in Facebook Ads Manager.

Have a great day!"

33. Plaintiff Palmer replied on May 12, 2019 at 1:48pm:

"Hello! Thank you for approving my ad.  However, it is still not running. Please advise."

34. Defendant Facebook caused a response to issue on May 12, 2019 at 2:55pm stating:

8

"Thanks for contacting Facebook.

It appears that your account has been disabled which would prevent me from reviewing any ad in particular. You will need to go into your Ads Manager and appeal your disabled account before any ads can be reviewed and set live. You can also follow this link to appeal a disabled account."

35. Plaintiff Palmer replied on May 13, 2019 at 12:05am that:

"My ad is for an educational online summit about medical marijuana and the cannabis industry for informational purposes."

36. Minutes later, Defendant Facebook replied at 12:09am that:

"*Here's what's preventing your ad from running:*

Image: We don't allow ads that promote illegal, prescription, or recreational drugs.

Video: We don't allow ads that promote illegal, prescription, or recreational drugs.

Text:   We don't allow ads that promote illegal, prescription, or recreational drugs.

Landing Page: We don't allow ads that promote illegal, prescription, or recreational drugs.

*The reason behind our policies:*

We don't allow the promotion of such products because they're illegal in many parts of the world. I suggest you have a look at our Advertising Policies for more details.

*What to do next:*

Try editing your ad by following the policy guidelines mentioned above. You can do that through Ads Manager, here. You can also check out Facebook Blueprint,

which allows you to go through self-paced e-learning module on Facebook's Advertising Policies."

## Despite Being a Private Social Media Platform, Facebook Engaged In Unlawful Censorship

37. Plaintiffs' promotion of the May 20-24 free On-Line Summit should not have been censored by Defendant's algorithm in the first instance.

38. Upon information and belief, an algorithm, rather than a human being, initiated the appellate review, but could not discern that the promoted ad was intended to advance the dialogue of matters of public health and national concern.

39. Upon information and belief, an algorithm, rather than a human being, decided on behalf of Facebook, for a second time, to wrongfully censor the intended boosted post because it could not discern that the purpose was to promote an educational program and not any drug legal or illicit.

40. Despite inducing Plaintiffs to expend monies to boost the post to increase awareness of adults about The CannaramicOnlineine Summit in the 33 legalized states, Facebook censored the post, refused to broadcast it after so inducing Plaintiffs, and has had no intent to return the funds which they wrongfully induced Plaintiffs to expend.

41. As a result, Defendant Facebook has violated New York General Business Law § 349 and committed common law fraud thereby causing economic harm to Plaintiffs.

42. As a result of Facebook's actions, users of Defendant's social media platform have been denied access to targeted advertising information about this critical On-Line Summit less than a week prior to the dates of the summit, severely hampering the Plaintiff's ability to promote the event or find other vehicles to do so.  The Plaintiff had intended to spend significant funds on Facebook promotions to help reach Plaintiff's goal of 500,000 summit

participants. The sudden timing of Facebook's ban, after otherwise allowing the same content to remain resident on the Cannaramic Facebook homepage, did not provide Plaintiff with ample time to pivot with a new strategy to reach Plaintiff's audience, thereby severely reducing the potential reach of The Cannaramic Online Summit and causing a significant loss in Plaintiff's investment of time, financial and human resources from the project inception in December 2018 until the current date.

43. Whether by stroke of a key, or the mathematical wizardry of an algorithm censorship module, Facebook suddenly and repeatedly interdicted the express intent of subscribers who wished to receive Cannaramic's messages from accessing Cannaramic's targeted and boosted lawful educational content. Simultaneously, Facebook undermined Cannaramic's capacity to communicate with those willing and voluntary followers of its otherwise lawful speech.

44. If Facebook were a governmental actor, Facebook's actions would plainly violate core constitutional principles of free speech. Facebook's actions would be deemed "open and shut" violations of First Amendment principles.

45. In the immortal words of Justice Robert Jackson, writing for the Supreme Court in *West Virginia State Board of Education v. Barnette*, 319 U.S. 624 (1943), "If there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion or force citizens to confess by word or act their faith therein."

46. Facebook's actions not only censored Cannaramic's and Ms. Palmer's rights to transmit information, but also violated the rights of their voluntary followers to receive that information. "It is now well established that the Constitution protects the right to receive

11

information and ideas." *Stanley v. Georgia*, 394 U.S. 557, 564 (1969).   The First Amendment "freedom embraces the right to distribute literature, . . . and necessarily protects the right to receive it." *Martin v. City of Struthers, Ohio*, 319 U.S. 141, 143 (1943), *citing Lovell v. Griffin*, 303 U.S. 444, 452 (1938)).  "[T]he right to receive publications is such a fundamental right. . . It would be a barren marketplace of ideas that had only sellers and no buyers." *Lamont v. Postmaster General*, 381 U.S. 301, 308 (1965) (Brennan, J., concurring).

47. In short, it is plain that were Facebook a governmental actor, its authority, high or petty, would not permit it to interdict or substantially frustrate the transmission or reception of the messages of Plaintiffs to their followers.  Such content-based and viewpoint-based discrimination would violate the rights of Plaintiffs to propagate their messages and the rights of its followers to receive them.

48. Facebook is not a governmental official, "high or petty."  However, it is an enterprise with extraordinary power and leverage over the contemporary national and international marketplace of ideas and marketplace of commerce.

49. The Supreme Court of the United States recognized, in *Packingham v. North Carolina*, 137 S.Ct. 1730, 1725 (2017), the manner in which social media generally, and Facebook particularly, have come to occupy a position similar to that of the traditional public forum in the public square:

A fundamental principle of the First Amendment is that all persons have access to places where they can speak and listen, and then, after reflection, speak and listen once more. The Court has sought to protect the right to speak in this spatial context. A basic rule, for example, is that a street or a park is a quintessential forum for the exercise of First Amendment rights .... Even in the modern era, these places are still essential venues for public gatherings to celebrate some views, to protest others, or simply to learn and inquire. While in the past there may have been difficulty in identifying the most important places (in a spatial sense) for the exchange of views,

today the answer is clear. It is cyberspace--the "vast democratic forums of the Internet" in general, ... and social media in particular. Seven in ten American adults use at least one Internet social networking service .... One of the most popular of these sites is Facebook, the site used by petitioner leading to his conviction in this case. According to sources cited to the Court in this case, Facebook has 1.79 billion active users .... This is about three times the population of North America

50. Here, Plaintiffs were engaged in lawful behavior and the promotion of educational programing in the virtual public square provided by Facebook's social media platform – a platform that is believed to be engage in the commerce of ideas and goods of some 2.2 billion users today.

51. While Facebook is a private company, publicly traded, and not a governmental entity, this lawsuit proceeds on the premise that Facebook is not invisible to the rule of law. Facebook is not an impregnable fortress impenetrable to the fundamental principles of the private law of torts, contracts, and fraud, as developed by the common law and statute, governing the actions of powerful players in the marketplace.

52. Just as private universities, not formally governed by the First Amendment, may have imposed upon them standards of academic freedom and due process imported from constitutional law norms and binding upon them through statutes and common-law principles governing deceptive or misleading conduct, so too Facebook may be answerable for arbitrary and capricious acts of censorship that are deceptive, misleading, fraudulent, and violative of public policy.  It is upon these premises that this lawsuit proceeds.

## II.  Jurisdiction and Venue Statement

49. This Court has diversity of citizenship subject matter jurisdiction under 28 U.S.C. § 1332. There is complete diversity among the parties, and the amount in controversy exceeds $75,000.  This Court has personal jurisdiction over Facebook, which has purposefully availed itself of the laws of New York, operates large offices in the Southern District of

New York, reaps substantial revenues from advertising sold to New York companies and residents, and specifically engaged Cannaramic Media and Ms. Palmer in an ongoing course of conduct directed at their operations and activities in New York.

50.     Venue is proper in the United States District Court for the Southern District of New York under 28 U.S.C. § 1391(b) and (c) the District in which a substantial part of the events or omissions giving rise to the claims occurred, and the District in which Facebook is subject to personal jurisdiction.

51.     The substantive content of Cannaramic Media provided by Ms. Palmer is grounded in personal experience with cannabis as an ongoing health concern and fostering the national discussion about cannabis, its regulation, scientific exploration, and political ramifications. Such conveyance of Plaintiffs' beliefs is constitutionally protected freedom of speech. To the extent that educators and experts that participated in the On-Line Summit interviews raised religious considerations about cannabis, such views and Plaintiffs' efforts to broadcast them and promote them by means of a boosted post would be constitutional as the free exercise of religion.

52.     Cannaramic actively posts cannabis related material from other sources upon its Facebook page and occasionally solicits written articles and video materials from contributors. Plaintiffs do not pay contributors for their submissions.

53.     Plaintiffs do not advocate that its subscribers engage in illegal conduct. Rather, they seek to address issues and concerns of national importance about cannabis and specifically targeted only those adults in the 33 legal states with regard to the Online Summit post that was supposed to be boosted after monies were paid to Facebook.

**Causes of Action**

14

**COUNT I**
## VIOLATION OF NEW YORK GENERAL BUSINESS LAW § 349

54.   Facebook engaged in aggressive marketing and solicitation to encourage businesses such as Cannaramic and business persons such as Ms. Palmer to use Facebook, and its various products and programs, as a hub for their business efforts, and vehicle through which the content on the Cannaramic.com website could be effectively monetized by boosted posts containing hyperlinks to the proprietary site.

55.   Responding to Facebook's inducements through its marketing and solicitation efforts, Cannaramic and Ms. Palmer created a business page on Facebook, and used Facebook's tool to boost a post for a fee.

56.   Responding to Facebook's inducements through its marketing and solicitation efforts, Cannaramic and Ms. Palmer followed Facebook's instructions for boosting the post for a fee to distribute the content about the On-Line Summit from the Cannaramic home page.

57.   Facebook's actions were consumer oriented, deceptive or misleading in a material way, and the cause of Plaintiffs injuries.

58.   Plaintiffs Cannaramic Media and Ms. Palmer have suffered injury-in-fact and monetary loss as a result of Facebook's violation of General Business Law § 349.

59.   The test under General Business Law § 349 for whether Facebook's business practice of collecting a fee to boost a post and then having an algorithm censor it and concealing the practice after accepting the fee constituted a prohibited practice under the statute requires involves an examination of whether Facebook's actions were materially deceptive or misleading to a reasonable consumer under the circumstances.

60.   Measured against this established standard, Facebook's actions plainly were materially deceptive and misleading.  The negative impact on Plaintiffs is substantial as they are

prevented from being able to advance the national dialogue regarding cannabis in a meaningful way by promoting their free Online Summit which is strictly educational in nature.

61. For Facebook to actively induce businesses such as Cannaramic Media and individuals such as Ms. Palmer to use its various programs, services, and platforms to run and monetize their businesses, without disclosing its algorithm formula which is designed to censor boosted advertising posts that relate to cannabis on purely educational ground not only harms Plaintiffs and the larger national audience of over 150 million people that live in legalized states, but was plainly "immoral, unethical, oppressive, unscrupulous."

62. Facebook's actions run contrary to public policy, engaging in content-based and viewpoint-based discrimination that directly affront American traditions of freedom of speech.  While Facebook is not a governmental entity, it holds itself out as a company dedicated to the free exchange of ideas and information, operating to facilitate public discourse and commerce.  For Facebook to hold itself out as a vast digital forum for discourse and commerce, and then engage in a clandestine regime of arbitrary and capricious censorship, after inducing Plaintiffs to expend monies to promote the very OnLine Summit that was then prohibited from promotion, deeply offends American public policy.  Facebook's arbitrary and capricious reliance upon algorithmic censorship is contrary to any sense of ethical business practice or fair dealing and falls squarely within the scope of unfair business practices prohibited by § 349.

63. Facebook's deceptive communications with Cannaramic and Ms. Palmer that the post would be permitted and the account enabled again was a deliberately disingenuous

explanation for the continued censorship of the boosted post which constitutes fraudulent

acts or practices prohibited by § 349 all of which have served to harm Plaintiffs.

## COUNT II
## COMMON LAW FRAUD

64. Cannaramic Media and Ms. Palmer re-plead and incorporate by reference the allegations

set forth in paragraphs 1-63 as if more fully set forth herein.

65. Facebook engaged in material false representations, when it induced Plaintiffs, to their

detriment, pay a fee and boost the post regarding the free Cannaramic Online Summit to

be held on May 20-24, 2019 on the proprietary website www.Cannaramic.com

66. Facebook knew that its promise to promote the post after accepting the fee was intended to

defraud Plaintiffs, who reasonably relied upon the representations of Facebook, and

suffered damage as a result of such reliance.

**WHEREFORE,** on Counts I and II, Plaintiffs seek compensatory and punitive damages in an
amount to be determined at trial

Dated: New York, New York
        May 15, 2019

The Law Offices of David Clifford Holland, P.C.

201 East 28th Street
New York, New York 10016
212-842-2480